## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **PRESBYTERIAN MANORS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 09-2656-KHV** |
| **SIMPLEXGRINNELL, L.P.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Presbyterian Manors, Inc. brings suit against SimplexGrinnell, L.P. for breach of express warranty (Count I), negligence (Count II), negligence per se (Count III), recklessness (Count IV), breach of service agreement (Count V) and punitive damages (Count VI).[1] On May 11, 2010, the Court dismissed plaintiff's claim of negligence per se. Memorandum & Order (Doc. #18). This matter is before the Court on Defendant SimplexGrinnell LP's Motion For Summary Judgment (Doc. #96) filed March 20, 2011. Defendant seeks summary judgment on plaintiff's remaining claims for the following reasons: (1) to the extent of the subrogation interest of plaintiff's insurer, the parties' subrogation waiver agreement bars plaintiff's claims; (2) to the extent that plaintiff seeks to recover insured damages, the anti-subrogation rule bars plaintiff's claims; (3) plaintiff's tort claims must fail because defendant's only duty to plaintiff was contractual; (4) plaintiff cannot recover punitive damages because it has no evidence that defendant authorized or ratified the allegedly reckless conduct of its employee; and (5) plaintiff's discovery responses preclude it from recovering damages

---

[1] The Court has diversity jurisdiction under 28 U.S.C. § 1332. The parties have stipulated that Kansas law applies. Pretrial Order (Doc. #129) at 2; see also Memorandum & Order (Doc. #18) at 3-5 (court will apply Kansas law notwithstanding choice of law provision selecting Massachusetts law).

for losses that plaintiff's insurance company has already paid. For the reasons stated below, the Court overrules defendant's motion for summary judgment.

### Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

The Court views the record in a light most favorable to the party opposing the motion for summary judgment. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is

not significantly probative.  <u>Liberty Lobby</u>, 477 U.S. at 250-51.  In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.  <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Liberty Lobby</u>, 477 U.S. at 251-52.

<b><u>Factual Background</u></b>

The following material facts are uncontroverted, deemed admitted or, where controverted, viewed in the light most favorable to defendant, the non-movant.

On June 11, 2002, plaintiff entered into a contract in which defendant agreed to inspect plaintiff's fire sprinkler systems and backflow preventers in accordance with an Inspection Plus Proposal which the parties signed in 2002.  The Inspection Plus Proposal provided that defendant would perform quarterly and annual inspections, and that plaintiff would name defendant and its officers, employees, agents, subcontractors, suppliers and representatives as additional insureds on plaintiff's general liability and auto liability policies.  Doc. #96, Ex. A at 12.  The Inspection Plus Proposal also included a "waiver of subrogation" provision in which plaintiff and all others claiming for it under the Agreement released and discharged defendant from all hazards covered by plaintiff's insurance, "it being expressly agreed and understood that no insurance company or insurer will have any right of subrogation" against defendant.  <u>Id.</u>  The Inspection Plus Proposal stated that it would remain in effect from year to year, until terminated in writing by either party.  Plaintiff still uses defendant's inspection services.

In 2006, the parties signed another Inspection Plus Proposal which only covered testing and

inspection of backflow preventers.  The Proposal stated in part as follows:

> **Entire Agreement.** The Parties intend this Agreement, together with any attachments or Riders (collectively the "Agreement["]) to be the final, complete and exclusive expression of their Agreement and the terms and conditions thereof.  This Agreement supersedes all prior representations, understandings or agreements between the parties, written or oral and shall constitute the sole terms and conditions of sale for all equipment and services.

Id. at 22.

On October 8, 2008, in a "Proposal and Service Agreement," defendant offered to perform an obstruction inspection of the sprinkler system of Aberdeen Village.[2]  Aberdeen Village is an assisted living property at 17500 West 199th Street in Olathe, Kansas, which plaintiff owned.  The first page of the Proposal and Service Agreement stated the scope of work which defendant proposed to perform and the price of such service.  It also stated in part as follows:

> In accepting this Proposal, Customer agrees to the terms and conditions contained herein including those on the following pages of this Agreement and any attachments or riders attached hereto that contain additional terms and conditions.  It is understood that these terms and conditions shall prevail over any variation in terms and conditions on any purchase order or other document that the Customer may issue. . . .  ATTENTION IS DIRECTED TO THE LIMITATION OF LIABILITY, WARRANTY, INDEMNITY AND OTHER CONDITIONS ON THE FOLLOWING PAGE.

Doc. #96, Ex. A at 51.  The second page of the proposal contained numerous terms and conditions.[3]  Plaintiff never received the second page of the proposal.

On October 9, 2008, Sheila McDowell, plaintiff's Director of Environmental Services, signed

---

[2]     The National Fire Protection Association ("NFPA") required the inspection.

[3]     The second page of the proposal contained boilerplate terms and conditions regarding the following matters: payment, code compliance, limitation of liability, general provisions, repair services, system requirements, reports, limited warranty, indemnity, insurance, exclusion/force majeure, one-year limitation on actions and choice of law, assignment, merger clause, severability and legal fees.

the proposed Agreement and faxed it to Ron Elkins, defendant's Deficiency Specialist.  The fax cover sheet stated, "Ron, please get this scheduled immediately.  I appreciate the system gauges at no charge.  Please call me . . . and let me know when we can expect service."  Doc. #96, Ex. A at 54. The fax included the first page of the Agreement which McDowell had signed, but not the second page which stated the terms and conditions.

Defendant performed the obstruction inspection on October 16, 2008.  At that time, Barry Blackburn, a service fitter for defendant, and Cory Gerner, a janitor for plaintiff, signed another Proposal and Service Agreement.[4]

Both agreements pertain to the obstruction inspection which defendant performed on October 16, 2008 and contain identical terms, including the following provisions which limited defendant's liability and plaintiff's remedies.[5]  In Paragraph 3 plaintiff agreed that defendant was not an insurer, that any insurance coverage would be obtained by plaintiff and that "amounts payable to [defendant] hereunder are based upon the value of the services and the scope of liability set forth in this Agreement and are unrelated to the value of the Customer's property and the property of others located on the premises."  Doc. #96, Ex. A at 52 ¶ 3.  Paragraph 3 continued as follows:

> [Plaintiff] agrees to look exclusively to the [plaintiff's] insurer to recover for injuries or damage in the event of any loss or injury and that [plaintiff] releases and waives all right of recovery against [defendant] arising by way of subrogation. [Defendant] makes no guaranty or Warranty, including any implied warranty of merchantability or fitness for a particular purpose that equipment or services supplied by [defendant]

---

[4]     When Gerner signed the Agreement, he thought he was signing a receipt which indicated that defendant's employees had performed the work.

[5]     The obstruction inspection, which the parties also refer to as the five-year inspection, is one of the bases for plaintiff's negligence, recklessness and breach of service agreement claims. Plaintiff claims that in performing the obstruction inspection, defendant left water in the dry sprinkler system which caused a pipe to burst when the water froze.

will detect or avert occurrences or the consequences therefrom that the equipment or service was designed to detect or avert.[6]

_____

[6]     The entire limitation of liability/limitation of remedy provision states as follows:

It is understood and agreed by the Customer that the Company is not an insurer and that insurance coverage, if any, shall be obtained by the Customer and that amounts payable to company hereunder are based upon the value of the services and the scope of liability set forth in this Agreement and are unrelated to the value of the Customer's property and the property of others located on the premises. Customer agrees to look exclusively to the Customer's insurer to recover for injuries or damage in the event of any loss or injury and that Customer releases and waives all right of recovery against Company arising by way of subrogation. <u>Company makes no guaranty or Warranty, including any implied warranty of merchantability or fitness for a particular purpose that equipment or services supplied by Company will detect or avert occurrences or the consequences therefrom that the equipment or service was designed to detect</u>.

It is impractical and extremely difficult to fix the actual damages, if any, which may proximately result from failure on the part of Company to perform any of its obligations under this Agreement. Accordingly, <u>Customer agrees that Company shall be exempt from liability for any loss, damage or injury arising directly or indirectly from occurrences, or the consequences therefrom, which the equipment or service was designed to detect or avert</u>. Should Company be found liable for any loss, damage or injury arising from a failure of line equipment or service in any respect, Company's liability shall be limited to an amount equal to the Agreement price (as increased by the price for any additional work) or where the time and material payment term is selected, Customer's time and material payments to Company. . . . If Customer desires Company to assume greater liability, the parties shall amend this Agreement by attaching a rider setting forth the amount of additional liability and the additional amount payable by the Customer for the assumption by Company of such greater liability, provided however that such rider shall in no way be interpreted to hold Company as an insurer. . . .

Doc. #96, Ex. A at 52 ¶ 3, 58 ¶ 3.

    In its prior order, the Court addressed whether defendant breached an express warranty. The Court held that defendant expressly warranted that its workmanship would be free from defects for 90 days and that defendant was liable for all consequential damages caused by a breach of this warranty. The Court noted that defendant argued it disclaimed all other warranties, but did not directly address this argument.

    The Court then addressed whether defendant had disclaimed liability for its breach of the

(continued...)

-6-

Id.

In paragraph 10, plaintiff agreed to indemnify defendant against any "losses damages, costs, including expert fees and costs, and expenses including reasonable defense costs, arising from any

---

[6](...continued)
express warranty under the limitation of liability provision. The Court held that because the disclaimer of consequential damages (i.e. the limitation of liability provision), was located in a separate section than the express warranty and did not refer to the express warranty, defendant had not disclaimed liability for consequential damages caused by a breach of the express warranty. The Court did not address the "designed to detect or avert" clause here.

The Court also addressed whether the limitation of liability provision disclaimed liability for defendant's alleged negligence (i.e. whether the provision barred plaintiff's negligence claims). On this score, the Court held as follows:

> Here, the service agreement did not expressly disclaim liability for negligent workmanship by defendant. While defendant disclaimed liability for damages that the service and system were designed to prevent or avert, i.e. fires, it did not clearly and unequivocally disclaim liability for its own negligence. Furthermore, it appears that the parties' primary intent was to disclaim liability for fire-related damages, not damages on account of defendant's negligent workmanship. The Court therefore finds that the security agreement did not disclaim liability for claims arising from defendant's own negligence. Defendant's motion to dismiss such claims is therefore overruled.

Doc. #18 at 10.

In this portion of the Court's order, the Court was referring only to the limitation of liability provision (the second underlined provision above) and not the waiver or warranties provision which appears directly after the waiver of subrogation provision. The Court so interpreted the limitation of liability clause because that clause is expressly limited to "damage or injury arising directly or indirectly from occurrences, or the consequences therefrom, which the equipment or service was designed to detect."

The more difficult question is whether the subrogation provision, which does not contain this express limitation, is likewise limited to fire-related damages. The subrogation provision uses absolute terms – "Customer agrees to look exclusively to the Customer's insurer to recover for injuries or damage in the event of any loss or injury and that Customer releases and waives all right of recovery against Company arising by way of subrogation" – but it appears in the middle of the limitation of liability/limitation of remedy provision which is generally limited to fire-related damages.

and all third party claims for personal injury, death, property damage or economic loss . . . arising in any way from any act or omission of [plaintiff] or [defendant] relating in any way to this Agreement, including but not limited to the Services under this Agreement, whether such claims are based upon contract, warranty, tort (including but not limited to active or passive negligence), strict liability or otherwise . . . ."  Id. ¶ 10.

Paragraph 11 obligated plaintiff to name defendant and its officers, agents, subcontractors, suppliers and representatives as "additional insureds" on its general liability and auto liability policies.  Id. ¶ 11.  Finally, paragraph 17 stipulated that defendant was entitled to recover from plaintiff "reasonable legal fees" incurred in connection with defendant enforcing the Agreement.  Id. ¶ 17.

On October 24, 2008, after the obstruction inspection, defendant performed annual and quarterly inspections of the sprinkler system at Aberdeen Village.  Duane Lynnes, an employee of defendant, performed the inspection and filled out a "Report of Sprinkler Inspection" form.[7]  On the form, Lynnes (1) marked "N/A" with respect to whether he had drained auxiliary drains during the inspection; and  (2) left the line for "No. Of Aux. Drains" blank even though Aberdeen Village had three auxiliary drains and a main drain.  He also stated that plaintiff's sprinkler system was pitch tested within the past five years, even though the record contains no evidence that defendant

---

[7]    The parties dispute whether this inspection was covered by one of the inspection plus proposals.  The inspection which Lynnes performed on October 24, 2008, is a basis for plaintiff's negligence, recklessness, breach of service agreement and punitive damages claims. Plaintiff essentially argues that Lynnes' inspection was incomplete, that he should have drained the water from the dry sprinkler system and that defendant acted with reckless disregard or complete indifference with respect to Lynnes' substandard inspection.

recommended or performed a pitch test.[8]  Based on this form, plaintiff argues that Lynnes' inspection was inadequate and that defendant acted with reckless disregard or complete indifference to the deficiencies in his inspection.

On December 23, 2008, a pipe burst at Aberdeen Village and caused extensive damage. Plaintiff alleges that in performing the obstruction inspection, defendant filled the dry sprinkler system with water and failed to drain it, causing water in the pipes to freeze and causing a pipe to burst.

Plaintiff's insurance company, Travelers Property and Casualty Company of America, "had an obligation to pay," and did pay $940,508.64 for plaintiff's damages.[9]  Doc. #96, Ex. C.  The parties dispute the nature of this payment.  Defendant argues that the payment constituted payment of an insurance claim and that Travelers is therefore subrogated to plaintiff's claims.  Plaintiff argues that the payment was part of a loan receipt agreement under which Travelers loaned plaintiff the money because plaintiff's claim for damages was disputed and contingent.  In that regard, plaintiff cites a loan receipt agreement which stated that plaintiff had received $940,508.64 as a no-interest loan from Travelers.  The loan was "repayable ONLY in the event and to the extent of any recovery [plaintiff] or [defendant] on behalf of [plaintiff] may make from any third-party . . . including but not limited to Simplex Grinnell, L.P., who may be liable to [plaintiff] for any damages to [Aberdeen Village]

---

[8]        According to plaintiff, the NFPA recommends a pitch test every five years because improper pitching, or angling, of sprinkler pipes could cause water to collect in the pipes and not drain from the system, which in turn could cause the pipes to rupture in cold temperatures.  Plaintiff asserts that a cursory review of defendant's past work would have shown that defendant had not performed a pitch test, but plaintiff does not cite evidence to support this assertion.

[9]        It is unclear, however, what Travelers' obligation to plaintiff was; neither party has attached the policy to their summary judgment briefs.

resulting from a water loss that occurred on December 23, 2008." Doc. #114, Ex. 6. As the term was used in the loan receipt agreement, "damages" included "property damages, income loss, clean-up, remediation and any other damages or expenses" incurred at Aberdeen Village as a result of the events on December 23, 2008.

As security for repayment of the loan, plaintiff pledged to Travelers "all rights to any claims, actions and/or other suits against [defendant], its subsidiaries and/or any other person and/or entity that may be liable to [plaintiff] for any and all damages to [Aberdeen Village] and otherwise caused by the Incident and any recovery made therefrom." Id. In addition, plaintiff agreed to let Travelers present its claim against defendant "for damages to the Subject Property and otherwise resulting from The Incident and, if necessary to commence and prosecute any claims, actions and/or suits in [plaintiff's] name, at the risk and expense of and subject to the exclusive direction, management and control of [Travelers]." Id. Plaintiff also agreed that Travelers could have "exclusive control of all claims and legal proceedings commenced and prosecuted in [plaintiff's] name arising from The Incident for damages to [Aberdeen Village]." Id. Under the contract, "[a]ny funds received from any person and/or entity liable for the Incident shall be paid first to satisfy this Loan and the expenses, costs and/or fees incurred in prosecuting any claims, actions and/or suits." Id. Thereafter, any funds recovered in excess of the loan amount and related expenses, costs and/or fees would be paid to plaintiff. Id.

Plaintiff relies on the loan receipt agreement to assert that Travelers is not subrogated to its claims and that the waiver of subrogation clause does not apply to its claims. Defendant argues that Travelers is subrogated to plaintiff's claims and that the waiver of subrogation bars plaintiff's claims to the extent of Travelers' subrogation interest, i.e. $940,508.64.

The parties agree that Travelers has a financial interest in this lawsuit because plaintiff must repay any money, up to $940,508.64, that it recovers from defendant in this lawsuit.[10]   Phillip Newmarker, a claims handler for The Travelers Companies, Inc., the parent entity of Travelers Property and Casualty Insurance, and Stan Churchill, Corporate Counsel for plaintiff, state in sworn affidavits that plaintiff's claim is "disputed and contingent." Doc. #114, Exs. #8 ¶ 5, 9 ¶ 5. Craig Reinmuth, plaintiff's Regional Director of Operations, has testified that the dispute pertained to "roughly 40 some thousand dollars" that Travelers' "CPA is disputing." Reinmuth Depo., Doc. #114, Ex. 7 at 109. Travelers has stipulated that under its insurance policy with plaintiff, it "had an obligation to pay" plaintiff for damages caused by the incident. Doc. #96, Ex. C.

After plaintiff disclosed its loan receipt agreement, it stated that all damages it claimed were above and beyond payments made by an insurer under an insurance policy. Interrogatory No. 17 and plaintiff's response state as follows:

> **Interrogatory No. 17:** If you have made a claim or been paid on a claim for any benefits under any insurance policy to recover any benefit related to the Occurrence, state the name and address of the entity to whom such claim was made, the date such claim was made, and the nature and amount of any payment received. If you seek damages above and beyond payments received and/or claimed from your insurer, state the nature and amount of any damages sought.

> **ANSWER:** Plaintiff objects on the basis that the requested information is irrelevant, immaterial and not reasonably calculated to lead to the discovery of admissible evidence. Subject to, and without waiving said objection, all damages claimed by Plaintiff are "above and beyond" payments made by an insurer under an insurance policy.   Plaintiff has received monies based on a loan receipt agreement.

Doc. #96, Ex. D (emphasis added).

---

[10]      The parties have disputed whether plaintiff hid the fact that Travelers has an interest in this lawsuit.  Magistrate Judge Gary Sebelius addressed plaintiff's nondisclosure of Travelers' interest in the lawsuit in his Memorandum & Order on defendant's motion for sanctions. Doc. #130.

Plaintiff has not disclosed a damages expert.  Plaintiff states that its Chief Financial Officer, Bruce Shogren, will testify as to its damages.  As to lost profits, plaintiff provided hundreds of pages of detailed spreadsheets which contain lost profit calculations and offered to make Shogren available for deposition to further explain its claim of $594,085.00 in lost profit damages.[11]

## Analysis

### I.      Loan Receipt Agreement

The parties' principle disagreement is whether plaintiff's loan receipt agreement with Travelers is valid.  Plaintiff argues that its insurance claim is disputed and contingent; therefore the loan agreement is valid and Travelers is not subrogated to plaintiff's claims.  Defendant argues that the loan receipt agreement is a sham and that Travelers' purported loan to plaintiff is actually a payment of plaintiff's claim.  Whether the loan receipt agreement is valid, and whether Travelers is subrogated to plaintiff's claims, are important questions because they implicate other issues in this case including whether plaintiff's claims are limited to the extent of Travelers' interest, whether the waiver of subrogation clauses in the parties' agreements apply and whether the anti-subrogation rule applies, all of which are raised in defendant's motion for summary judgment.[12]

Loan receipt agreements "have generally, if not universally, been held to be valid as true loans where the obligation or liability of the insurer advancing or lending the money was not absolute but

---

[11]      Defendant disputes whether plaintiff made Shogren available for deposition, but offers no affidavit or evidence to support its contention.

[12]      Courts have held that where a valid loan agreement exists, the insurance company is not subrogated and plaintiff may bring the claims in its own name even though the insurance company controls the litigation.  See T.S.I. Holdings, Inc. v. Buckingham, 885 F. Supp. 1457, 1461-62 (D. Kan. 1995) (holding that loan receipt agreement was valid and therefore insured was proper party under Rule 17).

was contingent, conditional, excess or undetermined." Hiebert v. Millers' Mut. Ins. Ass'n of Ill., 212 Kan. 249, 253, 510 P.2d 1203, 1208 (1973).  For example, in the seminal loan receipt agreement case of Luckenbach v. W.J. McCahan Sugar Ref. Co., 248 U.S. 139 (1918), the lender-insurer's liability was contingent upon whether a third party's negligence caused plaintiff-insured's loss.  Similarly, in Hiebert, the lender-insurer's liability was contingent upon whether plaintiff-insured was acting within the scope of his employment when he accidentally shot and killed his friend.  212 Kan. at 254, 510 P.2d at 1208.  If he was, then the lender-insurer would be liable for the loss, if not, then a different insurance company would be liable for the loss.  Id.[13]

Courts disagree, however, with respect to whether a loan receipt transaction constitutes a valid loan where the insurer's liability is absolute, and Kansas courts have not addressed the issue.  See id. The primary effect of a loan receipt is to keep alive a third person's liability to an insured for a loss and to permit the insured to prosecute the action in its own name.  Id.; Insurance-Loan Receipts, 13 A.L.R.3d 42 at 49-51.  Where a loan receipt agreement is deemed a valid loan – and not a payment of the insurer's liability to its insured – the insurer is not subrogated to the insured's rights against third persons.  Hiebert, 212 Kan. at 253-54, 510 P.2d at 1208; Insurance-Loan Receipts, 13 A.L.R.3d 42 at 49-51.  An insurer is subrogated to plaintiff's rights only if the agreement is a subterfuge for payment of the insured's claim and constitutes a discharge of the insurer's obligation.  Hiebert, 212 Kan. at 253-54, 510 P.2d at 1208; Insurance-Loan Receipts, 13 A.L.R.3d 42 at 49-51.

---

[13]     The loan receipt agreement which the Kansas Supreme Court upheld in Hiebert is much different than the agreement here.  It required the insured to pay interest and did not expressly give the insurance company exclusive control.  The agreement upheld by the U.S. Supreme Court in Luckenbach is much more similar to the agreement in this case, except for the important fact that in that case the insurance company's liability was clearly contingent – if a third-party was found to have been negligent then the insurance company would owe the insured nothing.

Here, plaintiff has submitted affidavits by  Phillip Newmarker, a claims handler for The Travelers Companies, Inc., the parent entity of Travelers Property and Casualty Insurance, and Stan Churchill, corporate counsel for plaintiff, which state that plaintiff's claim is "disputed and contingent."  Doc. #114, Exs. #8 ¶ 5, 9 ¶ 5.  Neither affidavit states whether Travelers' liability – as opposed to the amount of damages – was disputed or contingent.  See id.  Craig Reinmuth, plaintiff's Regional Director of Operations, testified that the dispute pertained to "roughly 40 some thousand dollars" that Travelers' "CPA is disputing."  Reinmuth Depo., Doc. #114, Ex. 7 at 109.  In addition, Travelers stipulated that, pursuant to its insurance policy with plaintiff, it "had an obligation to pay" plaintiff for damages caused by the incident.  Doc. #96, Ex. C.

Thus, the record on summary judgment on this question is both sparse and conflicting.  On the one hand, Travelers has stipulated that it had an obligation to pay plaintiff's claim.  On the other hand, plaintiff and a Travelers' claims handler state that plaintiff's claim is disputed and contingent. Plaintiff has not produced its insurance policy with Travelers and other than the affidavits, it has not provided any specific evidence that Travelers' liability was contingent.

This does not appear to be an ordinary loan receipt agreement case – only one insurer is involved and the record contains no evidence of conflicting contract provisions which would render Travelers' liability to plaintiff contingent.  See Luckenbach, 248 U.S. 139; Hiebert, 212 Kan. 249, 510 P.2d 1203.  Given the incomplete and conflicted state of the record, however, the Court cannot determine at this time whether plaintiff's loan receipt agreement is valid.  The Court therefore finds that defendant is not entitled to summary judgment on this issue or its claims concerning the waiver of subrogation clause or the anti-subrogation rule.

## II.    Plaintiff's Tort Claims

Plaintiff brings tort claims for negligence (Count II) and recklessness (Count IV).  Defendant argues that it is entitled to summary judgment on these claims because its only duties to plaintiff were contractual.  In addressing defendant's motion to dismiss, the Court rejected this argument for the following reasons:

> Under Kansas law, not all tort claims are barred by the existence of a valid contract.  See Regal Ware, Inc. v. Vita Craft Corp., 653 F. Supp.2d 1146, 1152 (D. Kan. 2006) (citing Burcham v. Unison Bancorp, Inc., 276 Kan. 393, 414, 77 P.3d 130, 145 (2003)).  When conduct could satisfy the elements of both a breach of contract and an independent tort, plaintiff may pursue both remedies unless the conduct is permitted by the express provisions of a contract.  Id.  Here, plaintiff properly alleges the elements of a negligence claim and the service agreement did not expressly permit defendant to fail to drain the pipes which eventually froze.  Accordingly, plaintiff may pursue its negligence claims in addition to its contract claims.

Doc. #18 at 8.  For reasons previously stated, defendant's argument is without merit.

## III.    Punitive Damages

Defendant moves for summary judgment on plaintiff's claim for punitive damages arguing that plaintiff has not produced evidence that defendant acted in a willful, wanton, fraudulent or malicious manner.[14]  Plaintiff's complaint alleges that defendant was reckless in inspecting, testing and maintaining the sprinkler System at Aberdeen Village.  Plaintiff argues in response to defendant's motion for summary judgment that the inspection report by Lynnes, defendant's employee, shows that defendant acted in reckless disregard of or with complete indifference to the imminent danger posed by Lynnes' inadequate inspection.

As an employer, defendant can be liable for punitive damages for the tortious conduct of its

---

[14]      Defendant also argues that punitive damages are not available in contract claims; however, as noted above, plaintiff's claims include tort claims for negligence and recklessness.

-15-

employees only if "the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer." K.S.A. §§ 60-3701(d), 60-3702(d); Lindsey v. Miami Cnty. Nat'l Bank, 267 Kan. 685, 690-91, 984 P.2d 719, 723 (1999); Ducharme ex rel. Rogers v. Bd. of Cnty. Com'rs of Butler Cnty, No. 09-2338-JTM, 2011 WL 2173684, at *10 (D. Kan. June 2, 2011). "Authorization is generally accomplished before or during the employee's questioned conduct and may be based on an express grant of authority or on a course of conduct implying authority. Ratification is more likely accomplished during or after the questioned conduct and may be express or implied." Lindsey, 267 Kan. at 692, 984 P.2d at 724. Authorization and ratification require that a person expressly empowered to authorize or ratify know of the improper actions and condone them, either explicitly or implicitly. Id.

To recover punitive damages, plaintiff must prove by clear and convincing evidence, that defendant acted willfully, wantonly, or with fraud or malice. K.S.A. §§ 60-3701(c), 60-3702(c). Plaintiff may prove wanton conduct by showing that defendant realized imminent danger and acted with reckless disregard or complete indifference to the probable consequences of its actions. Messer v. Amway Corp., 210 F. Supp.2d 1217, 1236 (D. Kan. 2002). A negligent act may be wanton for purposes of recovering punitive damages, if defendant realized the imminence of injury to others from acts or omissions and refrained from taking steps to prevent injury because of indifference as to whether such injury occurred. Id. (citing Atkinson v. Orkin Exterminating Co., Inc., 5 Kan. App.2d 739, 746, 625 P.2d 505, 511-12 (1981)).

On a motion for summary judgment, plaintiff bears the burden of producing sufficient evidence from which a reasonable juror could conclude by clear and convincing evidence that defendant has done so. Id. (citing Fusaro v. First Family Mortgage Corp., 17 Kan. App.2d 730, 735,

843 P.2d 737, 741 (1992)).  In support of its claim for punitive damages, plaintiff has presented evidence that on October 24, 2008, Lynnes performed a quarterly inspection of the sprinkler system at Aberdeen Village.  Plaintiff argues that Lynnes' "Report of Sprinkler Inspection" indicate that defendant acted with reckless disregard and/or complete indifference to probable harm that could result from Lynnes' inadequate inspection in the following respects: (1) Lynnes marked "N/A" with respect to whether he drained auxiliary drains during the inspection; (2) he left the line for "No. of Aux. Drains" blank even though Aberdeen Village had three auxiliary drains and a main drain; and (3) he indicated that plaintiff's sprinkler system was pitch tested within the last five years even though there is no evidence that defendant ever recommended or performed a pitch test.  Plaintiff argues that Lynnes' report put defendant on notice of the "imminent danger" of his inadequate inspection, and that by doing nothing to rectify the errors, defendant acted in "reckless disregard and/or complete indifference to the probable harm to Plaintiff's property or the lives of the elderly residents living in Plaintiff's facility."  Doc. #114 at 18.

Defendant's inaction in light of Lynnes' report raises a genuine issue of material fact as to whether acted wantonly.  Therefore, the Court overrules defendant's motion for summary judgment on plaintiff's claim for punitive damages.

## V.     Limitation On Amount Of Damages

Plaintiff seeks $994,471.00 in damages, which includes $454,590.35 in damage to real and personal property and $539,880.65 in lost income and extra expenses associated with the pipe burst incident on December 23, 2008.  Defendant's motion for summary judgment asks the Court to limit the amount of damages which plaintiff may recover to those which are "above and beyond" $940,508.64, which is the amount which plaintiff received from Travelers under the loan receipt

agreement.  Defendant relies on plaintiff's response to Interrogatory No. 17, which states that "all damages claimed by Plaintiff are 'above and beyond' payments made by an insurer under an insurance policy," and that plaintiff "has received monies based on a loan receipt agreement."  Doc. #96, Ex. D.

Defendant argues that plaintiff's answer limits its damages to those which exceed the amount of the loan receipt agreement.  Plaintiff argues that it has not received any "payments" for its insurance claim and therefore all damages which it claimed were above and beyond any payments made by an insurer under an insurance policy.  Plaintiff's answer to Interrogatory No. 17 is not a model of clarity.  Conspicuously absent from its response is any explanation that plaintiff did not consider the funds which it received under the loan receipt agreement to be "payments" by its insurer.  As Judge Sebelius noted in his order on defendant's motion for sanctions, however, defendant knew by June of 2010 that plaintiff did not consider the funds which it received under the loan receipt agreement to be "payments" by an insurer under an insurance policy.

Defendant does not argue that by answering Interrogatory No. 17 as it did, plaintiff violated an order.  Rather, defendant simply argues that any recovery should be limited to damages over and above the amount of the loan receipt agreement.  Even though plaintiff's response could have been clearer, defendant has not shown that plaintiff's response was so misleading or prejudicial to warrant limiting the amount of damages which plaintiff may recover.

## VI.    Lost Profits Claim

Defendant seeks summary judgment on plaintiff's claim for lost profits.  Defendant argues that plaintiff has not sufficiently established its lost profits.  Specifically, defendant asserts that (1) plaintiff has not disclosed an expert to forecast plaintiff's lost profits and (2) plaintiff has not

disclosed the basis for its lost profits claim.  Plaintiff argues that it is not required to use an expert to establish its lost profits claim because its Chief Financial Officer, Bruce Shogren, is competent to testify to its lost profits caused by the incident.

### A.    Lost Profits Expert

Defendant argues that plaintiff must present expert testimony to forecast its alleged lost profits because its lost profits damages are not supported by facts, but are merely recited in spreadsheets compiled by a third-party accounting firm.  Defendant relies heavily on the fact that Reinmuth, plaintiff's Regional Director of Operations, was unable to provide the basis for plaintiff's damages at his deposition on February 4, 2011.  Plaintiff counters that Shogren calculated plaintiff's lost profit damages and that plaintiff made Shogren available for deposition for the very purpose of explaining such damages.[15]  Cerulo Affidavit, Doc. #114, Ex. 10.  Plaintiff further asserts that the basis of Shogren's lost profits valuation is "straightforward and commonsense."  Defendant argues that it is "highly unlikely" that Shogren has sufficient personal knowledge to testify regarding plaintiff's lost profits.

Under Rule 701, Fed. R. Evid., a lay witness may give testimony in the form of "opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  The Tenth Circuit and this Court have noted that a business owner may testify as to the entity's damages from lost profits so long as such testimony satisfies the requirements of Rule 701, Fed. R.

---

[15]      Again, defendant disputes whether plaintiff made Shogren available for deposition, but offers no affidavit or evidence to support its contention.

Evid.  See LifeWise Master Funding v. Telebank, 374 F.3d 917, 929–30 (10th Cir. 2004) (collecting cases); Mooring Capital Fund, LLC v. Knight, 388 Fed. Appx. 814, 824-25 (10th Cir. 2010) (business owner may be qualified to testify about lost profits when (1) owner have sufficient personal knowledge of business and factors in estimating lost profits or (2) owner's evaluation based on straightforward, commonsense calculations); Jayhawk Capital Mgmt., LLC v. LSB Indus., Inc., No. 08–2561–EFM,  2011 WL 1626581, at *8 (D. Kan. April 28, 2011) (under certain circumstances business owner may testify regarding lost profits).  Therefore, to the extent his testimony satisfies Rule 701, Fed. R. Evid., Shogren may testify regarding plaintiff's lost profits.

Defendant's motion for summary judgment on plaintiff's claim for lost profits is more appropriately characterized as a motion to exclude Shogren's testimony.  Indeed, this is the subject of one of defendant's several motions in limine.  Defendant Simplex Grinnell's Motion *In Limine* Regarding Plaintiff's Lost Profit Damages (Doc. #140).  Because defendant did not depose Shogren and because his proffered testimony is not before the Court, it would be premature to decide whether to exclude Shogren's testimony at this time.  The question is whether plaintiff has offered sufficient evidence to establish a reasonably certain claim for lost profits.

### B.   Basis For Lost Profits Claim

Defendant's motion for summary judgment on plaintiff's lost profits claims focuses on alleged discovery violations by plaintiff for not disclosing detailed computations of plaintiff's lost profits damages.  Specifically, defendant argues that plaintiff did not set forth a computation of lost profits damages in its Rule 26, Fed. R. Civ. P., disclosures and refused to provide sufficient evidence to

support its claim in response to Interrogatory No. 22.[16]  Plaintiff states that it provided Shogren's

calculation of its lost profits in its first response to defendant's request for production.

Rule 26(a)(1)(A)(iii) requires a party to provide a computation of each category of damages

it claims.  Rule 37(c)(1), Fed. R. Civ. P., provides that if a party fails to provide information required

to be disclosed by Rule 26(a), Fed. R. Civ. P., the party is not allowed to use that information or

witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

justified or is harmless.  Here, plaintiff has produced to defendant numerous summaries of its losses

and modified them over time.  The spreadsheets include calculations of lost income based on general

lost revenue, additional lost revenue due to the adjustment of apartment rates because of the flood,

and other flood-related expenses including extra expenses, flood staffing costs and the cost of

---

[16]     Interrogatory No. 22 and plaintiff's response are as follows:

**Interrogatory No. 22:** State the following information relating to Plaintiff's
claim for lost profits and/or business interruption damages resulting from the
December 23, 2008 incident:
    a) The total amount of damages;
    b) The total amount [of] uninsured damages (i.e. damages that Plaintiff
    sustained but was not compensated for under any policy of insurance).
    c) A complete, detailed computation of the damages; the nature and the
    source of the loss of income, profit and earnings; and
    d) The factual information used to calculate Plaintiff's damages.

**ANSWER:** Objection. Defendant's interrogatory is overbroad, unduly
burdensome, vague and ambiguous. Subject to, and without waiving said objection,
Plaintiff answers as follows:
    a) $594,085
    b) $594,085
    c) See Objections noted above.
    d) See Objections noted above.
    e) See Objections noted above.

Doc. #97, Ex. H.

relocating residents to Olathe North Homestead.  Thus, it appears that plaintiff has complied with its

obligation under Rule 26(a)(1)(A)(iii), Fed. R. Civ. P.

The question, then, is whether the information which plaintiff did disclose raises a genuine

issue of material fact as to the amount of its loss.  See Kelley Metal Trading Co. v. Al-Jon/United,

Inc., 877 F. Supp. 1478, 1484 (D. Kan. 1995) (lost profits must be proven with "reasonable certainty")

(citing Vickers v. Wichita State Univ., 213 Kan. 614, 618, 518 P.2d 512, 515 (1974)).  The Kansas

Supreme Court explained the type of evidence which plaintiff must produce to prove lost profits:

> Unquestionably, a method of establishing a loss of profits with reasonable certainty
> is by showing a history of past profitability. Past profitability of a particular business
> is not, however, the only method of proving lost future profits. The evidence necessary
> in establishing lost future profits with reasonable certainty must depend in a large
> measure upon the circumstances of the particular case. Absolute certainty in proving
> loss of future profits is not required. What is required is that the court or jury be
> guided by some rational standard. As to evidentiary matters a court should approach
> each case in an individual and pragmatic manner, and require the claimant to furnish
> the best available proof as to the amount of loss that the particular situation admits.
> It is the responsibility of a district court to see that speculative and problematical
> evidence does not reach the jury.

Vickers, 213 Kan. at 620, 518 P.2d at 517 (citations and internal quotations omitted).

Defendant only indirectly addresses plaintiff's burden of proof.  It argues that plaintiff has not

disclosed the basis for its lost profits claim and has only produced inconsistent spreadsheets setting

forth information regarding damages, but not a calculation of lost profits.  Plaintiff states that it has

produced a detailed calculation of its lost profits.  In the pretrial order, plaintiff seeks $539,880.65

in lost income and extra expenses associated with the loss.  As noted above, plaintiff has produced

summaries of its losses, which include calculations of lost income, and has updated those summaries

over time.  It is unclear how plaintiff calculated the $539,880.65 amount, but it appears that the

summaries could contain sufficient data to establish the amount of its loss with reasonable certainty.

The Court therefore overrules defendant's motion for summary judgment on plaintiff's claim for lost profits.

## VI.    Legal Fees

Defendant argues that under the parties' agreements, if defendant "is forced to litigate claims such as this, and is forced to incur legal fees, Plaintiff must pay for these fees."  Doc. #97 at 22.  The provision which defendant references states as follows: "[Defendant] shall be entitled to recover from the [plaintiff] all reasonable legal fees incurred in connection with [defendant] enforcing the terms and conditions of this Agreement."  Doc. #97, Ex. A at 58 ¶ 17.  Because the Court defers ruling on the validity of the loan receipt agreement, whether Travelers is subrogated to plaintiff's claims and the enforceability of the parties' various agreements, it would be premature to determine whether defendant is entitled to recover legal fees at this time.  The Court therefore overrules defendant's request for legal fees.

**IT IS THEREFORE ORDERED** that Defendant SimplexGrinnell LP's Motion For Summary Judgment (Doc. #96) filed March 20, 2011 be and hereby is **OVERRULED**.

Dated this 29th day of July, 2011 at Kansas City, Kansas.

s/  Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge